
UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CR 12-30115-RAL |
| Plaintiff, | * | |
| vs. | * | OPINION AND ORDER |
| | * | ADOPTING REPORT AND |
| CLINT BROWN, | * | RECOMMENDATION |
| Defendant. | * | |

Defendant Clint Brown ("Brown") was charged in a superseding indictment with being a felon and a drug user in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 922(g)(3), and 924(a)(2). Doc. 33. Brown filed a Motion to Suppress Evidence. Doc. 21. Magistrate Judge Mark A. Moreno held a bifurcated hearing on the motion on December 6, 2012 and December 10, 2012. T.[1] 1. Judge Moreno heard testimony from Lyman County Sheriff Steve Manger, Trooper Shane Severyn of the South Dakota Highway Patrol, Lyman County Deputy Sheriff Don Jennings, and Special Agents Jason Jares and Chad Mosteller of the South Dakota Division of Criminal Investigation ("DCI"). T. 2, 18, 77, 78, 91, 116. Judge Moreno received fifty exhibits into evidence. T. 2-3. On January 31, 2013, Judge Moreno issued a Report and Recommendation, Doc. 50, recommending that Brown's Motion to Suppress Evidence be denied. On February 15, 2013, Judge Moreno issued an Addendum to Report and Recommendation, Doc. 56, recommending that Brown's oral addendum to the Motion to Suppress Evidence made during the hearing be denied. The Report and Recommendation, and its Addendum, were served upon the parties as required by 28 U.S.C. § 636, and Brown timely objected. Doc. 54; Doc. 57.

---

[1] Any references to the suppression hearing transcript will be "T" followed by the page number or numbers.

In considering a magistrate judge's recommendation on a dispositive matter, such as a motion to suppress evidence, a district court must make a "de novo determination of those portions of the report or . . . recommendations to which objection is made." 28 U.S.C. § 636(b)(1). This Court has conducted a de novo review of the record. For the reasons explained below, this Court adopts the Report and Recommendation.

## I. Facts

Brown is seeking to suppress evidence collected from four different searches of his property made pursuant to three different search warrants. Doc. 54 at 1. Brown also is seeking to suppress both a urine analysis on a urine sample that he provided upon entry to jail and a statement that he made when giving that urine sample. Doc. 54 at 1-2.

### A. August 17, 2012 Warrant

The first warrant at issue was dated August 17, 2012, and issued to Lyman County Sheriff Steve Manger on August 17, 2012. Ex. 2. Between August 14, 2012 and August 17, 2012, Sheriff Manger was contacted by Officer Danny Hoffman of the Russell Kansas Police Department. T. 20. Officer Hoffman told Sheriff Manger that Officer Hoffman had spoken with a woman named Tonya Brookshire at a hospital in Russell, Kansas, on August 13, 2012. T. 20-24. Brookshire told Officer Hoffman that she was recently involved in a domestic violence incident in Presho, South Dakota. T. 20-24. Officer Hoffman called Sheriff Manger, told him what Brookshire reported, and sent Sheriff Manger his police report. T. 20-24; Ex. 1. Officer Hoffman's police report captures Brookshire's description of the incident: Brookshire was living with Defendant Clint Brown in Presho, Brown slammed her body onto a tractor's gear shift while she was driving it, Brown choked Brookshire and slammed her head into a concrete wall, and Brown threatened to kill her. Ex. 1.

Brookshire had bruises on her right thigh, left shin, ribs, right shoulder, and her seventh and eighth ribs were broken. Ex. 1; T. 24. Brookshire also told Officer Hoffman that she witnessed Brown smoking methamphetamine on August 11, 2012. Ex. 1. Sheriff Manger used this information from Officer Hoffman when preparing his search warrant application and affidavit.

Sheriff Manger also obtained information for his warrant application and affidavit from Brown's mother, Barb Brown. T. 27-30. On the morning of August 17, 2012, Barb Brown had gone to Brown's house to see Brown's daughter M.B. T. 27-28, 32. Brown would not let Barb Brown inside, he pushed her out the front door, and he barricaded himself into his house. T. 27-29. Barb Brown explained that Brown had been paranoid since his girlfriend left and that on the morning of August 17, 2012, he was "extremely paranoid" and "wigging out." T. 30. She feared that Brown was using methamphetamine and was worried for M.B.'s safety. T. 27-30, 32. Barb Brown also told the officers that Brown had her 12-gauge shotgun and a .22-caliber rifle in his possession. T. 32. Sheriff Manger had known Brown since around 1988 and knew Brown to be a convicted felon because Sheriff Manger had arrested Brown on a charge that led to a felony drug conviction. T. 25, 32-33. Barb Brown also told the officers that Brown had used a gun recently when he shot and killed M.B.'s dog two days earlier on her birthday, August 15, 2012, and made M.B. watch while he shot the dog. T. 30.

Sheriff Manger relied on the information provided by Officer Hoffman, Barb Brown, and Deputy Jennings to craft the application and affidavit for the warrant to justify entering Brown's house and ensuring the safety of M.B. on the morning of August 17, 2012. T. 37, 56-57. The search warrant was for the house at 407 S. Birch Ave in Presho, a small shed on the property, and vehicles parked on the property. Ex. 2. The warrant sought the two guns believed to be in Brown's

possession, evidence of narcotics use, and evidence related to a domestic violence incident. Ex. 2. Magistrate Judge Leo Disburg of the Sixth Judicial Circuit of South Dakota issued Sheriff Manger the warrant on the morning of August 17, 2012. Ex. 2.

After receiving the warrant, Sheriff Manger gathered a group of officers from a variety of agencies to execute it. As the team approached the house, Sheriff Manger called Brown to try and persuade him to come outside based on the two men's personal history. T. 42. Brown did not answer the phone, so Sheriff Manger walked up to the house, knocked on the door, and identified himself as a member of the sheriff's department. T. 43. After a short time, a young female voice answered from behind the closed door. T. 43-44. The young girl told Sheriff Manger to be quiet so he would not wake up her father and that the front door was barricaded shut. T. 44-45. Sheriff Manger told her to go to the back door. T. 45-46. The girl complied, exited out the backdoor, and ran directly to Sheriff Manger. T. 46-47. The girl, later identified as Brown's daughter M.B., was distraught, shaking, and crying when she got to Sheriff Manger, who put his arm around her and took her to his patrol car. T. 47. M.B. told Sheriff Manger that "He's going to kill me" or "He said he would kill me." T. 49. M.B. had visible injuries to her forehead and later Sheriff Manger noticed additional injuries to her left foot. T. 48-50; Exs. 8-10.

After M.B. left the trailer and went with Sheriff Manger, Trooper Shane Severyn, among others, entered the house through the back door. T. 72-73. Trooper Severyn found Brown asleep in his bedroom in his boxer shorts. T. 73. Officers placed Brown in handcuffs, emptied out the pockets of the jeans that he wanted to wear, and brought him outside. T. 74. DCI Agent Jason Jares was designated to photograph evidence gathered during the August 17, 2012 search. T. 91. In Brown's home and trucks, officers found and Agent Jares photographed a number of pieces of

evidence, including a .22-caliber rifle, a 12-gauge shotgun, ammunition, marijuana, and drug paraphernalia. Exs. 16-29. The officers also collected a cell phone from the pocket of Brown's jeans and both jump and flash drives. Ex. 30. The front door was barricaded shut by a couch turned on its side and shoved against the door. Exs. 17-18. After the search, Brown was placed under arrest for "aggravated assault, commission of a felony while armed with a firearm, . . . possession of a firearm by a felon, possession of a controlled substance, [and] possession of less than two ounces of marijuana." T. 79.

Brown was moved to Deputy Sheriff Don Jennings' patrol car and transported 40 miles to the Brule County Jail in Chamberlain, South Dakota. T. 78-79. Brown was not given Miranda warnings. T. 87. During the trip, Jennings did not question nor speak much, if at all, to Brown. T. 82-83. In the booking area of the Brule County Jail in Chamberlain, Deputy Jennings told Brown that Jennings was going to collect a urine sample from him. T. 80, 83. As Deputy Jennings handed Brown a urine sample cup, Brown said that his "piss is going to melt right through that cup." T. 83. Brown's urine analysis tested positive for methamphetamine and marijuana. Ex. 50.

### B. August 18, 2012 Warrant

Agent Jares wrote the application and affidavit for a second search warrant that was issued on August 18, 2012. T. 92; Ex. 40. Agent Jares relied on his knowledge and the knowledge of DCI Special Agent Chad Mosteller in crafting the warrant application and affidavit. See Ex. 40. Agent Mosteller was present on the August 17, 2012 search and became the case agent for the assault portion of the case after the search was completed. T. 116. Agent Mosteller gathered information from M.B. by interviewing her and attending her forensic interview at the Child Assessment Center. T. 118-131. He relayed the information he received in these conversations to Agent Jares who then

drafted the warrant application and affidavit. T. 130-31. Agent Jares sought to search Brown's residence, any outbuildings, and his two trucks for evidence of the assault on M.B., electronic evidence, and firearms and ammunition. Ex. 40. On August 18, 2012, Magistrate Judge Disburg issued the warrant. T. 93; Ex. 40.

On August 18, Agent Mosteller executed the second search warrant and seized Brown's Chevy pickup truck, but did not collect evidence from the house's interior. T. 131. Also on August 18, M.B. took Agent Mosteller to the rural areas where the alleged assault on M.B. occurred and where Brown allegedly shot M.B.'s dog. T. 118-19. Agent Mosteller returned to this general area—a rural area stretching about two to five miles north of Presho near 305th Avenue—and the specific sites within that area M.B. pointed out to him for further investigation on August 19, 2012, during which he gathered evidence concerning the alleged assault and firearm use in this general vicinity on both days. T. 119-24; Ex. 30. Agent Mosteller also found the body of M.B.'s dead dog that Brown allegedly shot in front of her on her birthday, August 15, 2012. T. 120; Ex. 33.

### C. August 22, 2012 Warrant

After the August 18 search warrant was issued and after Agent Mosteller seized the Chevy pickup, Deputy Sheriff Don Jennings placed blue tape over the trailer's windows and doors that would indicate if anyone attempted to improperly enter the trailer. T. 132-33; Ex. 43. Agent Mosteller, however, still wanted to search and seize evidence from the interior of the house that he had not done when he seized the truck. T. 131-32. On August 22, Judge Disburg signed another search warrant written by Agent Jares that was modeled after the August 18 search warrant, Ex. 41 at 7, and Agent Mosteller reentered the house on August 22 and gathered additional evidence of firearm and narcotics usage. Ex. 42.

## II. Discussion

Brown makes seven objections to the Report and Recommendation and its Addendum: (1) the warrants lacked probable cause and the accompanying affidavits did not provide probable cause to justify their issuance; (2) the warrants did not illustrate a nexus between the criminal activity and the places to be searched and things to be seized; (3) the affidavits did not provide enough information to allow an issuing judge to determine whether the informants were sufficiently reliable to justify a finding of probable cause; (4) the warrants did not describe the property to be searched with sufficient particularity; (5) the evidence gathered pursuant to the warrants issued on August 18, 2012, and August 22, 2012, must be suppressed as tainted under the fruit of the poisonous tree doctrine because the warrants were issued pursuant to evidence gathered in the allegedly improper August 17, 2012 search; (6) the good faith exception does not apply; and (7) the urine analysis was collected in violation of Brown's Fourth Amendment rights and the statement made by Brown to Deputy Sheriff Jennings contravened Brown's Miranda rights. Doc. 54.

### A. Probable Cause

The Warrant Clause of the Fourth Amendment requires that warrants (1) be issued by a neutral and detached judge; (2) contain a particular description of "the place to be searched, and the persons or things to be seized"; and (3) be based "upon probable cause, supported by Oath or affirmation." Dalia v. United States, 441 U.S. 238, 255 (1979); see also U.S. Const amend. IV. Brown argues initially that the third requirement for a valid warrant—probable cause based on an affirmation—was not met. "Probable cause exists, if under the totality of the circumstances, a showing of facts can be made sufficient to create a fair probability that evidence of a crime will be found in the place to be searched." United States v. Wallace, 550 F.3d 729, 732 (8th Cir. 2008)

(citations and internal quotation marks omitted). When evaluating whether probable cause supported the issuance of a warrant, a court is to assess the "totality-of-the-circumstances" including the "'veracity' and 'basis of knowledge' of persons supplying hearsay information." Illinois v. Gates, 462 U.S. 213, 238-39 (1983). A reviewing court "is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." Id. (quoting Jones v. United States, 362 U.S. 257, 271 (1960)). A court's review should be "flexible" and not "hypertechnical," but the affidavit "must provide the magistrate with a substantial basis for determining the existence of probable cause." Id. at 236, 239. If the existence of probable cause is difficult to determine, "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." United States v. Ventresca, 380 U.S. 102, 109 (1965). Once a magistrate has determined that probable cause exists, that determination should be given "great deference." Gates, 462 U.S. at 236.

Brown argues that the August 17, 2012 warrant was not supported by probable cause. Doc. 54. This is not the case. Sheriff Manger's affidavit stated:

> On 8-17-12 I was contacted by Lyman County Deputy Sheriff Don Jennings who informed me that he had received a call from CLINT BROWN'S Mother, Barb Brown, informing him that CLINT was on some type of drugs. According to Deputy Jennings, CLINTS [sic] mother stated that ever since his girl friend [sic] left he has been paranoid. She stated that on 8-15-15 which was [M.B.'s] (Clints 10 year old daughter) birthday CLINT shot his 10 year her healthy dog in front of her. According to Deputy Jennings, Barb stated she went to the residence this morning to see [M.B.] and CLINT would not let her in the residence and barricaded the door. She stated that he is "wigging out."
>
> On 8-14-12 I received a call and later a report of a Officer Danny Hoffman with the Russell Kansas Police Department in reference to a Domestic Violence incident that took place in Presho, SD against

8

> his live in girl friend [sic], Tonya Brookshire. In Officer Russell's [sic] report Tonya made mention to him that Clint informed her that if she would try to leave he was going to find her and kill her. She also informed Officer Russell [sic] that on 8-11-12 she witnessed CLINT smoking Methamphetamine. According to Officer Russell's [sic] report while he was present with Brookshire at the hospital in Russell, Kansas Doctor Doerfler came into her room and informed her that her 7th and 8th ribs were broken.
>
> Mr Brown [sic] is also a convicted felon and under federal law . . . cannot possess a firearm or ammunition and according to mother Barb Brown he used a .22 caliber rifle to shoot the dog on 8-15-12.
>
> I contacted Barb Brown while typing out this search warrant and asked her what type of weapons Clint is in possession of and she stated that he has a .22 caliber rifle and a 12 gauge shot gun that actually belongs to her. Brown also advised that Clint has been going down hill [sic] for the past week and she made the comment to me that he needs help. She stated that he gets like this when he is using Meth.

Ex. 2.

Sheriff Manger's affidavit and the reasonable inferences one may draw from it provide sufficiently reliable information that evidence of a crime would be found in Brown's trailer, outbuildings, and pickup trucks to support the issuance of the warrant. Officer Hoffman, a fellow police officer, relayed information from Brookshire, a possible domestic violence victim, that Brown was a drug user and had assaulted her in Presho when the two were living together in Brown's trailer. The affidavit also recounted that Brown's mother said that Brown was acting paranoid, consistent with how he previously had acted when using methamphetamine, and that he had been trending this way all week. Barb Brown had personal knowledge that Brown was possessing a firearm because one of the firearms in his possession belonged to Barb Brown. Sheriff Manger's affidavit recounted that Barb Brown was worried for the safety of Brown's daughter because Brown was armed and had

9

recently used a firearm to shoot his daughter's dog in front of her on her birthday. This information, under a totality of the circumstances analysis, gave the issuing magistrate reason to believe that evidence of domestic violence, drug use, and firearm possession was inside Brown's house or inside his vehicles.

Brown argues that the August 18 and August 22, 2012 warrants lack probable cause because they are based on evidence gathered in the allegedly illegal search on August 17, 2012. Doc. 54. Agent Jares' affidavit was extensive and detailed. He recounted his participation in the August 17, 2012 search and his encounter with M.B. Ex. 40 at 3. The warrant described Sheriff Manger's interactions with the child:

> During execution of the Search Warrant . . . Sheriff Manger had a conversation with the child. She was identified as M.B. the juvenile daughter of Clint Brown. It was learned she had been struck by her father in the face and head with a shotgun. The child stated the assault had occurred earlier in the morning. The child was in distress.

Ex. 40 at 3. Agent Jares' affidavit explained that M.B. was transported to the hospital where she was diagnosed with head trauma that required a hospital stay. Ex. 40 at 3.

Agent Jares' affidavit included that he searched the Chevrolet truck on August 17, 2012, that the truck's driver's side window was smashed, and that Agent Jares observed and seized a Remington shotgun from the rear floorboard. Ex. 40 at 3. Agent Jares' affidavit continued that DCI Special Agent Chad Mosteller told him that "the child had disclosed the assault occurred out in a rural area near Presho." Ex. 40 at 3. M.B. reported that the assault on her occurred in a rural area, a gun was used, and Brown drove them home from the assault. Ex. 40 at 3. Further, the affidavit stated that the assault caused M.B. to bleed and soil herself such that Brown made her strip off her

10

clothes before riding back in his truck. Ex. 40 at 3. The affidavit explained that Agent Jares sought a search warrant for the interior of the house and truck because he felt it was reasonable to conclude that there may be evidence of this assault in the house and truck. Ex. 40 at 4. Although the agents already possessed Brown's cell phone, Agent Jares sought permission to mine the phone and other electronic evidence for evidence of M.B.'s lifestyle or living conditions. Ex. 40 at 4; T. 93.

On August 22, 2012, Agent Jares drafted another affidavit that replicated much of the affidavit provided to Judge Disburg on August 18, 2012. Ex. 41 at 2-4. This August 22 affidavit added information about Agent Mosteller's visits to the rural areas with M.B. Ex. 41 at 4.

Each of Agent Jares' affidavits was sufficient to justify a finding of probable cause that evidence of additional crimes related to drug possession, firearm possession, and evidence of domestic assaults against Brookshire and M.B. would be found at Brown's house and in Brown's car. Because the August 17, 2012 warrant and search were proper, evidence from that search was not tainted fruit and could be used to justify the issuance of additional warrants.

**B.   Nexus**

Brown argues that the warrants do not illustrate a nexus between his possible criminal activity and the places to be searched. "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue." United States v. Tellez, 217 F.3d 547, 550 (8th Cir. 2000). Much of what was discussed above in Part III.A applies with equal force to this issue. See supra Part III.A. A clear nexus exists between the contraband—evidence of domestic assault, drugs, and firearms—and the places to be searched—Brown's trailer, outbuildings, and vehicles on the property—to justify the August 18, 2012 warrant. Although the alleged domestic assault against Brookshire occurred outside the home, Brookshire was living in the trailer at the time

11

and Brown had threatened to kill her. M.B. told investigators that Brown used a gun in the assaults and, after making her strip off her soiled clothes, drove them home from the assault in his truck. Likewise, both Brookshire and Barb Brown claimed that Brown was on drugs and Barb Brown reported that he was in possession of firearms. It is reasonable to conclude that Brown would store any drugs and guns either in his home or vehicles. There is a clear nexus between the contraband sought and the property searched. The nexus is even stronger for the warrants issued on August 18 and August 22 because additional evidence of drug use, firearm possession and use, and the assault on M.B. had been uncovered inside the home, on his property, and in the truck.

### C. Reliability of Informants

Brown argues that probable cause was lacking because evidence supporting these warrants was hearsay information or information from people whom Brown did not have an opportunity to cross-examine. Doc. 54. Probable cause means less evidence than "would justify condemnation . . . and . . . a finding of 'probable cause' may rest upon evidence which is not legally competent in a criminal trial." Ventresca, 380 U.S. at 107 (internal citations and quotation marks omitted). Hearsay evidence can serve as the basis for a warrant if there is some "substantial basis for crediting the hearsay." Id.; see also United States v. Blaylock, 535 F.3d 922, 927 (8th Cir. 2008). Probable cause can be found in hearsay statements from reliable persons, hearsay statements from confidential informants that are corroborated, or observations made by law enforcement officials. Walden v. Carmack, 156 F.3d 861, 870 (8th Cir. 1998); see also United States v. Houston, 754 F. Supp. 2d 1059, 1074 (D.S.D. 2010). Information provided by a victim is presumed to be sufficiently reliable to support probable cause. See Chambers v. Maroney, 399 U.S. 42, 46 (1970) (noting that a victim's information was enough to support probable cause); 2 Wayne LaFave, Search & Seizure § 3.4(a) The

Veracity of a Crime Victim or Witness (5th ed. 2011) (noting that "veracity may be assumed when information comes from the victim of or a witness to criminal activity"). Similarly, "personal and recent knowledge of named eyewitnesses is sufficient to establish probable cause." United States v. Dukes, 432 F.3d 910, 913 (8th Cir. 2006); see also United States v. Palega, 556 F.3d 709, 714 (8th Cir. 2009) (noting that an informant is credible if the person is an eyewitness).

Here, the hearsay statements were sufficiently reliable to support issuance of the warrants. The information in the search warrant affidavits came from alleged victims, eyewitnesses, or other officers. The information provided was consistent and indicated recent criminal activity. This evidence was sufficiently reliable to justify the finding of probable cause.

### D.     Particularity

Brown takes issue with the particularity of the warrants because the warrants describe his home differently and do not state specifically where the evidence will be found. Doc. 54. Brown also contends that the August 17 warrant lacks the required particularity because it does not provide the license plate numbers for the vehicles to be searched. Doc. 54. A warrant satisfies the particularity requirement when "the place to be searched [is] described with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort and to avoid mistakenly searching the wrong premises." United States v. Gamboa, 439 F.3d 796, 806 (8th Cir. 2006) (internal quotation marks omitted). "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." Maryland v. Garrison, 480 U.S. 79, 84 (1987); see also United States v. Hibbard, 963 F.2d 1100, 1102 (8th Cir. 1992) ("The purpose of the

13

particularity requirement is to prevent a general exploratory rummaging through a person's belongings."); Blaylock, 535 F.3d at 927 (holding that a warrant "need not name any particular defendant against whom evidence will be used in order to be valid; it must only 'particularly describe the place to be searched, and the persons or things to be seized'"). The degree of specificity in a description that is required depends on the circumstances of the case and the types of items involved. United States v. Tyler, 238 F.3d 1036, 1039 (8th Cir. 2001). Vehicles found on the premises, even if they are not listed in the warrant, may be considered within the scope of a warrant that authorizes a search of the premises surrounding the vehicle. Gamboa, 439 F.3d at 807 (citing United States v. Pennington, 287 F.3d 739, 745 (8th Cir. 2002)).

Sheriff Manger's application described the property to be searched as follows:

> The residence is located at 407 S. Birch Ave in Presho SD the residence is a single wide trailer house gray in color. A small shed to the south. The vehicles that are parked at the residence include a green ford F-250 Pickup with a fuel tank in the rear that is operated by the subject and a black Chevy pickup SD Lic #.

Ex. 2. Sheriff Manger thought the trailer was a single wide with an addition, rather than a double wide, and did not specifically state that Brown owned the property. T. 54-55. Sheriff Manger's application sought:

> [a] .22 caliber Rifle and 12 Gauge Shotgun. Any illegal narcotics to include marijuana and drug paraphernalia. Any other evidence related to a Domestic Violence incident.

Ex. 2.

Agent Jares' August 18 warrant application described the property to be searched slightly differently than Sheriff Manger's description:

14

> Residence and outbuildings of Clint James Brown, identified as a blue/grey double wide trailer home with white trim, bearing house number 407, located on South Birch Street, Presho, South Dakota.
>
> A 2001 Chevrolet Pickup Truck bearing SD License Plate 45U358. . . . This vehicle is parked at the residence . . . .

Doc. 40. Agent Jares' August 18 warrant sought "[s]oiled clothing, hair, blood, and any other biological material or evidence of a physical assault of . . . M.B. located in the residence or vehicle of Clint Brown." Ex. 40. The warrant also sought electronic evidence including a "Black LG Cellular Telephone located on the bed of Clint Brown" and "[f]irearms, including but not limited to a Remington Magnum Shotgun, and a .22 rifle, ammunition and expended cartridges." Ex. 40.

The warrants described with sufficient detail the areas to be searched and the items to be seized. The August 17 warrant provided the correct address for Brown's house and a sufficiently accurate description such that an officer would not mistakenly search the wrong house. The warrant also accurately described the vehicles. The August 18 and August 22 warrants are even more specific because they included Brown's name and the license plates of the vehicles. The fact that Sheriff Manger described the trailer as a grey single wide—and believed it to be a single wide with an addition—and Agent Jares described it as a blue/grey double wide does not undermine the particularity of these descriptions because such a discrepancy would not lead a reasonable officer to mistake the residence for another, especially considering that the address was provided in each warrant. The relatively general description of evidence sought is sufficiently particular to sustain this warrant. See United States v. Horn, 187 F.3d 781, 788 (8th Cir. 1999) ("A warrant naming only a generic class of items may suffice if the individual goods to be seized cannot be more precisely

identified at the time that the warrant is issued.").

### E. Fruit of Poisonous Tree

Brown's "fruit of the poisonous tree" argument fails because the August 17, 2012 search warrant was supported by probable cause. See supra Part III.A.

### G. Good Faith Exception's Application

Judge Moreno recommended that even if the warrants were found to lack probable cause, the evidence need not be suppressed because of the applicability of the good-faith exception to the Fourth Amendment warrant requirement as set forth by United States v. Leon, 468 U.S. 897 (1984), and its progeny. Doc. 48 at 14. Brown objected to this conclusion. Doc. 51.

When violations of the warrant requirement occur, the Exclusionary Rule operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." Leon, 468 U.S. at 906. In Leon, the Supreme Court articulated a good-faith exception to the Exclusionary Rule. Id. at 920-21. Under the exception, the Exclusionary Rule is not to "be applied to exclude the use of evidence obtained by officers acting in reasonable reliance on a detached and neutral magistrate judge's determination of probable cause in the issuance of a search warrant that is ultimately found to be invalid." United States v. Taylor, 119 F.3d 625, 629 (8th Cir. 1997) (citing Leon, 468 U.S. at 905, 922); see also United States v. Gipp, 147 F.3d 680, 688 (8th Cir. 1998) (applying the Leon good-faith exception to a tribal search warrant). The Supreme Court explained the rationale behind the good-faith exception in this manner:

> It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form

16

> with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law. Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.

Leon, 468 U.S. at 921 (internal quotation marks and citation omitted).

"The exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." Id. at 916. "[S]uppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." United States v. Hessman, 369 F.3d 1016, 1021 (8th Cir. 2004) (citing Leon, 468 U.S. at 918). The good-faith exception does not exclude evidence when an officer's reliance on a warrant issued by a judge or magistrate is objectively reasonable. Leon, 368 U.S. at 922. An officer's reliance is not objectively reasonable, and the good-faith exception does not apply, in four circumstances: (1) when the issuing judge is misled by information that is false or made in reckless disregard for the truth; (2) when the issuing judge completely abandons the judicial role; (3) when the information provided to the judge includes so little indicia of probable cause that the officer's belief in its existence is entirely unreasonable; and (4) when the warrant is so facially deficient, i.e., in failing to particularize the place to be searched or the things to be seized, that the executing officer cannot reasonably presume it to be valid. Id. at 923; see also

17

Hessman, 369 F.3d at 1020 (noting these four situations).

Brown asserts that the good faith exception does not apply because (1) the warrant has so little indicia of probable cause that the belief in its existence is unreasonable and (2) the warrant is so facially deficient that the executing officer cannot presume it to be valid. Doc. 54 at 8-9. However, these warrants were supported by probable cause and, even if probable cause is lacking, the officer's belief in probable cause was objectively reasonable. Much of the analysis in Part III.A applies here to illustrate the reasonableness of the officers' belief in the existence of probable cause. See supra Part III.A. The officers provided detailed affidavits containing reliable information gathered from Brown's alleged victims, eyewitnesses of Brown's alleged drug use and gun possession, and other officers leading an investigation. The warrants are facially valid, describing with particularity where to search and what to seize such that an executing officer would assume them to be valid.

### H. Urine Analysis

Brown asserts that Deputy Sheriff Jennings obtained the urine sample from him in violation of his Fourth Amendment rights because Brown did not voluntarily give the sample and Deputy Sheriff Jennings had no warrant to take the sample. Compelled urinalysis is considered a search under the Fourth Amendment. See Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 617 (1989); United States v. Linder, 759 F. Supp. 2d 1133, 1143-44 (D.S.D. 2010). Probable cause sufficient for a warrantless search exists where the known facts and circumstances are sufficient to give a

person of reasonable prudence the belief that contraband or evidence of a crime will be found. Ornelas v. United States, 517 U.S. 690, 696 (1996).

Here, a person of reasonable prudence, knowing what Deputy Sheriff Jennings did at the time, would believe that evidence of a crime could be discovered through a urinalysis of Brown. See United States v. Twiss, 127 F.3d, 771, 773–74 (8th Cir. 1997) (finding that police had probable cause to compel urinalysis based upon the totality of the circumstances). Deputy Sheriff Jennings had arrested Brown on, among other charges, drug possession charges and knew of the reports from Barb Brown that Brown was acting paranoid just a few hours earlier consistent with how he acted when he was on methamphetamine. Thus, the evidence of the urinalysis need not be suppressed.

Next, Brown argues that the statement that Brown made when Deputy Sheriff Jennings gave him the specimen cup that his urine would "melt right though the cup" must be suppressed because it was obtained in violation of his Miranda rights. The Supreme Court of the United States held in Miranda v. Arizona, 384 U.S. 436 (1966), that any time a person is taken into custody for questioning they must be advised of their Fifth Amendment right to be free from self-incrimination in order "to counteract the 'inherently compelling pressures' of custodial interrogation." Arizona v. Roberson, 486 U.S. 675, 681 (1988) (quoting Miranda, 384 U.S. at 467). Miranda warnings are required prior to questioning "whenever a suspect is (1) interrogated (2) while in custody." United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990). "Interrogation" is the "direct questioning [by a law enforcement officer] or any practice reasonably likely to evoke an incriminating response from

a suspect." Id. (citing Rhode Island v. Innis, 446 U.S. 291, 301 (1980)).

Although Brown was in custody at the time of the statement, Brown was not subject to any interrogation. Deputy Sheriff Jennings testified that he did not ask Brown any questions, and Deputy Sheriff Jennings had not been attempting to engage Brown in conversation at all during the ride or at the jail. Deputy Sheriff Jennings' command that Brown urinate into the specimen cup was not reasonably likely to elicit an incriminating response. Brown nevertheless responded, not to a question but independently, stating that his urine would "melt right through the cup." Therefore, Deputy Sheriff Jennings did not interrogate Brown, and Brown's statement need not be suppressed.

## III. Conclusion

For the foregoing reasons, it is hereby

ORDERED that the Report and Recommendation, Doc. 50, and the Addendum to the Report and Recommendation, Doc. 56, are adopted by this Court. It is further

ORDERED that the Defendant's Objections to the Report and Recommendation, Doc. 54, Doc. 57, are overruled. It is finally

ORDERED that the Motion to Suppress Evidence, Doc. 21, is denied.

Dated March 11th, 2013.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE